IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


JASON S. BROOKNER,

      Plaintiff,


vs.                                               No. 10-cv-00639 JAP/KBM

SSC CORPORATION, a New Mexico Corporation,

SEAN M. CANTRELL, and

EVANGELINE LUJAN-VIGIL,


      Defendants.


FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.**     **INTRODUCTION**

      On August 16 and 17, 2011, the Court held a non-jury trial.  The Court believed that all of the witnesses who testified at trial were credible.  Each witness earnestly and honestly expressed the witness' observations and opinions. The individual parties did not overstate their cases.  In addition, all parties were well represented by their attorneys.  The Court finds it unfortunate that Plaintiff Jason Brookner purchased a home in 2007 at the height of the housing boom and that the home significantly decreased in value following his purchase.  However, as the Court explains below, Brookner failed to prove by a preponderance of the evidence that Defendants SSC Corporation, Sean Cantrell, and Evangeline Lujan-Vigil (collectively SSC) are

liable to Brookner for the diminished value of Brookner's home merely because SSC's appraisal valued the home higher than the retrospective appraisal Brookner later commissioned. Because the appraised value of a property is an opinion of value, not a statement of fact, two appraisals with the same effective date may significantly differ in their valuation of a property without either appraisal being performed incorrectly or negligently.  Rather, the difference in value may simply reflect the correct, but divergent, decisions that the appraisers made in selecting comparable sales and adjusting those sales to determine the value of the property.  Having determined that Brookner failed to meet his burden of proof, the Court will enter judgment in favor of SSC.

## II.      FINDINGS OF FACT

1.      On August 8, 2010, Plaintiff Jason F. Brookner filed an Amended Complaint for Breach of Contract and Negligent Misrepresentation (Doc. No. 11) (Complaint) against SSC.

2.      In his Complaint, Brookner alleged that SSC breached its contract with Bankers Financial Group (BFG), the company from which Brookner obtained a mortgage loan, by appraising the property at issue in this case incorrectly as a consequence of miscalculating the square footage of the house located on the property.

3.      Brookner also alleged that SSC negligently misrepresented the value of the property and the square footage of the house on the property.

4.      The claims asserted by Brookner arose in the State of New Mexico, County of Santa Fe, where the Property that is the subject of the claims is located.

2

5.      Brookner is an individual who, at all times relevant, was and is domiciled in the State of Texas, County of Dallas.

6.      Brookner is not an appraiser and does not have any expertise in the area of residential appraisals.

7.      Defendant SSC, Corporation ("SSC Corp.") is a New Mexico corporation, organized and existing under the laws of the State of New Mexico, and at all times relevant was doing business in the State of New Mexico as "Appraisals by Cantrell."

8.      Defendant Sean Cantrell ("Cantrell") is an individual who, at all times relevant, was and is domiciled in the State of New Mexico and is the principal of Defendant Appraisals by Cantrell.

9.      Cantrell is a certified appraiser in the State of New Mexico.

10.     Cantrell was an officer and employee of SSC Corp., and all of the actions of Cantrell in this case were in the course and scope of his employment with SSC Corp.

11.     Defendant Lujan-Vigil is an individual domiciled in the State of New Mexico and, at the time of the acts complained of herein, was employed as an independent contractor by SSC Corp. and was acting in furtherance of her job duties.

12.     At all times relevant to this action, Lujan-Vigil was an apprentice appraiser and otherwise subject to supervision by Cantrell who was Lujan-Vigil's "Supervisory

Appraiser."

13.     In the summer of 2007, Brookner's then girlfriend, Dawn Edelman, contacted

        Roy Hughes, a real estate agent, regarding purchasing a home in the Santa Fe,

        New Mexico area.

14.     Later during the summer of 2007, Brookner, Edelman, and Hughes viewed a

        number of properties in the Santa Fe area, focusing specifically on properties in

        what the parties refer to as the "Highway 14 marketing area"— an area south of

        Santa Fe that encompasses, among other areas, Madrid and Cerrillos, New

        Mexico.

15.     During that time, Brookner and Edelman viewed a property located at 27

        Hanuman Road, Cerrillos, New Mexico 87010 (the "Property").

16.     The Property consists of approximately 54 acres of land, on which is constructed

        a single family home containing one bedroom, one bathroom, a loft and a main

        living and dining area (the "House").

17.     The Property is "off the grid," meaning that no publicly available utilities run to

        or are present on the Property.  The Property is "self contained," with water

        provided from a private well, electricity provided through solar power, and gas

        provided through a private propane tank.

18.     The Property was listed for sale at $415,000 by Greg McMillan, a real estate

        broker in the Santa Fe area.

19.     McMillan believed that the listing price was reasonable.

20.     The property received numerous showings while it was on the market and three
separate offers were made on the Property prior to Brookner's offer.

21.     McMillan considered the market activity on the Property to be significant for this
area.

22.     The significant market activity on the Property reflected the reasonableness of the
listing price.

23.     The sellers accepted two of the offers that were made prior to Brookner's offer
and entered into purchase agreements with a buyer.  Both of those purchase
agreements fell through for unknown reasons.

24.     Edelman had a special interest in the "off the grid" features of the Property and
"fell in love" with the Property due to its views, its environmentally friendly
features, and the large acreage.

25.     On June 7, 2007, Brookner made an offer to purchase the home for $350,000.

26.     The sellers did not respond to Brookner's $350,000 offer.

27.     On June 14, 2007, Brookner made a second offer to purchase the home for
$385,000.

28.     After a number of counteroffers were exchanged between Brookner and the
sellers, Brookner agreed to purchase the Property for $400,000 by entering into a

Residential Purchase Agreement (Purchase Agreement) dated June 20, 2007.

29.     The effective date of the Purchase Agreement is the date that it was signed by both the sellers and Brookner—June 20, 2007.

30.     Paragraph 8(b) of the Purchase Agreement contained an appraisal contingency stating that Brookner's obligations under the Purchase Agreement "are conditional and contingent upon [Brookner] obtaining an appraisal of the property within 25 days (the "Appraisal Period") following the date of th[e Purchase] Agreement."  The appraisal contingency further provided that "[i]f the appraisal states a value lower than the purchase price, [Brookner] may notify seller of such lower appraised value on or before the last day of the Appraisal Period."

31.     The appraisal contingency provided that, in the event the appraised value of the Property was lower than the purchase price, the sellers could have elected to reduce the purchase price or Brookner could have terminated the Purchase Agreement.

32.     Paragraph 2(d) of the Purchase Agreement provided that "[a]ny time period in [the Purchase Agreement] which is calculated by reference to "days" or "Days" shall mean business days, i.e., excluding Saturdays, Sundays, and federally recognized holidays."

33.     After the sellers accepted Brookner's offer, Brookner sought to finance his purchase of the property through BFG.

6

34.   BFG retained SSC Corp. to perform an appraisal of the Property thus forming a contract between BFG and SSC Corp.

35.   While the contract expressly required SSC to perform an appraisal for purposes of determining the value of the Property, the contract did not expressly require SSC to accurately measure the square footage of the home.  That is, except to the extent that the square footage of the House was relevant to the valuation of the Property, the measurement of the House was not a part of the contract between BFG and SSC Corp.

36.   SSC Corp. was given a copy of the Purchase Agreement, as well as information pertaining to the purchase price and the amount of financing for the proposed purchase of the Property.

37.   SSC Corp. assigned Lujan-Vigil to perform an appraisal of the Property.

38.   Lujan-Vigil prepared a Uniform Residential Appraisal Report (SSC's Appraisal) that had an effective date of July 5, 2007.

39.   In order to prepare the appraisal, Lujan-Vigil inspected the Property, reviewed the multiple listing service for comparable sales, and spoke with Cantrell regarding the comparables that should be used for the Property.

40.   Lujan-Vigil and Cantrell selected four comparables that, in their opinion, were the most similar to the Property in terms of construction quality, construction style, and amenities.

7

41.    Lujan-Vigil and Cantrell adjusted the sales prices of the comparable sales by making adjustments that, in their opinion, accounted for the differences between the Property and the comparable sales.

42.    Lujan-Vigil and Cantrell did not believe that being off-the-grid affected the value of the Property.

43.    Cantrell reviewed the appraisal and co-signed the appraisal as "Supervisory Appraiser."

44.    On July 17, 2007, SSC Corp. delivered SSC's Appraisal to BFG.  BFG paid SSC Corp. in full for SSC's Appraisal.

45.    SSC's Appraisal valued the Property at $420,000 as of July 5, 2007.

46.    SSC's Appraisal stated the House had 1,743 square feet of gross living area.

47.    It was later determined that the House actually only had 1,398 square feet of gross living area.[1]  Thus, Lujan-Vigil incorrectly measured the square footage of the House.

48.    Had Lujan-Vigil used the correct square footage of the House, the appraised value of the Property would have been approximately $410,000 under SSC's Appraisal.

_____

[1]The Court notes that the listing flyer for the Property indicated that the House was 1,550 square feet.  This measurement was taken from a prior appraisal that had been given to McMillan.  There are thus three different measurements of the House in evidence.  Because SSC appears to have conceded that 1,398 square feet is the correct measurement, the Court finds that the House has 1,398 square feet of gross living area.

49.     SSC's appraised value of the Property would have exceeded the purchase price of the Property even if Lujan-Vigil had used the correct square footage.

50.     Prior to Lujan-Vigil's failure to correctly measure the square footage of the House, Brookner personally inspected the interior of the House, made the decision to purchase the Property, and entered into the Purchase Agreement.

51.     The Purchase Agreement did not contain any square footage contingency that would have allowed Brookner to terminate the agreement if the actual square footage of the home differed from the square footage stated in the listing flyer for the Property.

52.     SSC's Appraisal contained a number of other mistakes that demonstrated some carelessness on Lugan-Vigil's part.

53.     The mistakes made by Lujan-Vigil, except as noted above regarding the square footage, did not affect Lujan-Vigil's determination that the Property was valued at $420,000.

54.     As a result of SSC's Appraisal valuing the Property at an amount that exceeded the Purchase Price, the closing condition in section 8(b) of the Purchase Agreement was satisfied.

55.     On or around July 30, 2007, the sale of the Property to Brookner closed (the "Closing").

56.     As part of the Closing, Brookner was required to reimburse BFG for the amount it

had paid to SSC Corp. for SSC's Appraisal.

57.     Brookner  paid $80,000 as a down payment for the Property, and financed the
remaining $320,000 of the Purchase Price with a residential mortgage loan from
BFG, at 6.5% interest per annum payable over thirty (30) years.

58.     In March 2009, Brookner sought to re-finance his mortgage on the Property.  As
part of the re-finance process, the potential mortgagee (ViewPoint Bankers
Mortgage ("ViewPoint")) required an appraisal of the Property.

59.     Don Hall prepared a Uniform Residential Appraisal Report, with an effective date
of February 17, 2009  ("Hall's Appraisal").

60.     Unlike SSC, Hall utilized the correct square footage of the House when
performing his appraisal.

61.     According to Hall's Appraisal, the Property had a value of $295,000 as of
February 17, 2009.

62.     Brookner and ViewPoint each received a copy of Hall's Appraisal on or about
March 3, 2009.

63.     Subsequent to discussions with Hall, Brookner commissioned Hall to perform a
"retrospective appraisal" of the Property—an appraisal of the value of the
Property as of July 5, 2007.

64.     Hall completed his One-Unit Residential Appraisal Field Review Report

(Retrospective Appraisal) on July 20, 2009.

65.     The Retrospective Appraisal completed by Hall valued the Property at $270,000 as of July 5, 2007.

66.     In performing the Retrospective Appraisal, Hall utilized the correct square footage of the House.

67.     In performing the Retrospective Appraisal, Hall had access to the same sales data that Lujan-Vigil and Cantrell used in selecting comparable sales.

68.     Hall selected different comparable sales than the sales Lujan-Vigil and Cantrell had used in performing SSC's Appraisal.

69.     Hall selected the comparable sales he used because, in his opinion, those sales were the most similar to the Property in terms of design and other features.

70.     Hall believed that the Property being off-the-grid decreased the value of the Property.

71.     The comparable sales that Hall selected had significantly lower sales prices than the comparable sales that Lujan-Vigil and Cantrell selected.

72.     The Property is unique for the area in that it includes a very large acreage lot, the House was built using straw-bale construction, and the location is completely off-the-grid.

73.     The House on the Property is of good quality and was built using high-quality

construction techniques.

74.     There is not a lot of market activity in the Highway 14 marketing area and there

are few comparable sales to choose from.

75.     Properties in the Highway 14 marketing area are not homogenous and it is

therefore difficult to find truly comparable properties.

76.     Because of the unique nature of the Property, the unique nature of the area in

which the Property is located, and the low volume of sales activity, both Lujan-

Vigil and Hall had a difficult time finding comparable sales.

77.     Appraisers have considerable latitude in selecting comparable sales and adjusting

the prices of the comparable sales to determine the value of the property that is

the subject of an appraisal.  The determination of which comparable sales should

be used, as well as the determination of how to adjust the sale price of a

comparable sale, are subjective decisions that are made by each individual

appraiser.

78.     Given the unique nature of the Property and the low volume of sales in the area,

the comparable sales selected by Lujan-Vigil were not any better or any worse

than the comparable sales selected by Hall.

79.     The conduct of appraisers is governed by the Uniform Standards of Professional

Appraisal Practice (USPAP).

80.     USPAP does not require that appraisals be performed with perfection, as long as

an appraisal is credible.

81.   Both SSC's Appraisal and Hall's Retrospective Appraisal are credible and supported by the comparable sales utilized by each appraiser

82.   While it is perplexing that official appraisals of a property of this nature can result in such a wide range of appraised values, the fact that there is a significant difference in the valuation of the property between SSC's Appraisal and Hall's Retrospective Appraisal does not indicate that either appraisal is not credible. Because appraisals are opinions, the fact that two opinions vary significantly does not indicate that either opinion is inherently incorrect especially where, as here, there is limited comparable sales data and the property being appraised is unique.

83.   July 2007 was the peak of the "housing bubble"—a period of time in which home sales, and thus home prices, were rapidly increasing.

84.   Home sales, and thus home prices, rapidly decreased from July 2007 to early 2009.

85.   While not every property will follow the trend of the housing market, the market as a whole in the area of the Property decreased by approximately thirty-percent from 2007 to 2009.

86.   The decrease in the value of the Property between SSC's Appraisal of $420,000 in 2007 and Hall's Appraisal of $295,000 in 2009 is consistent with the decreasing market trend during that same time period.

13

87.   The increase in value of the Property between the appraised value of $270,000 in 2007 reflected in Hall's Retrospective Appraisal and the appraised value of $295,000 in 2009 reflected in Hall's Appraisal is inconsistent with the decreasing market trend during that same time period.

## III.   CONCLUSIONS OF LAW

1.   This Court has jurisdiction under 28 U.S.C. § 1332(a)(2) because this action is between a citizen of a state and citizens of a foreign state, and the amount in controversy exceeds $75,000.

2.   Venue in this District is proper under 28 U.S.C. § 1391(a)(2) as the events giving rise to Brookner's claims arose in the State of New Mexico, County of Santa Fe, and the Property that is the subject of Brookner's claims is located within the State of New Mexico, County of Santa Fe.

3.   Defendant Cantrell is liable for the actions of Defendant Lujan-Vigil as they pertain to the preparation of SSC's Appraisal.

4.   Defendant SSC is liable for the actions of Defendant Cantrell as they pertain to the preparation of SSC's Appraisal.

5.   In July 2007, the Defendants were in the business of providing appraisals for purchasers and lenders in residential purchase transactions.

6.   At all relevant times, Defendants Cantrell and Lujan-Vigil were professionally licensed and/or certified appraisers.

7.   SSC's Appraisal was prepared in the ordinary course of Defendants' business.

8.   To the extent that Brookner was entitled to rely on SSC's Appraisal for purposes of making a decision about purchasing the Property, Brookner failed to prove, by

a preponderance of the evidence, that SSC negligently misrepresented the value of the Property.

9.  Brookner failed to prove by a preponderance of the evidence that SSC breached any duty SSC may have owed Brookner.

10. Because SSC's valuation of the Property was credible, SSC's valuation of the Property was not the proximate cause of any damages to Brookner.

11. Because the contract between BFG and SSC was for the preparation of an appraisal for purposes of determining the value of the property, and because SSC prepared an appraisal that credibly valued the property at $420,000, Brookner failed to prove by a preponderance of the evidence that SSC breached the contract between SSC and BFG.

12. Even if the Court were to assume that Brookner was a third-party beneficiary of the contract between BFG and SSC Corp., and even if the Court were to assume that the contract required SSC Corp. to correctly calculate the square footage of the home, the Court concludes that Brookner did not suffer any damages as a result of SSC's failure to correctly measure the House.  Because the appraisal contingency only allowed Brookner to renegotiate or terminate the Purchase Agreement if the appraised value of the Property was lower than the Purchase Price, Brookner was not entitled to rely on SSC's Appraisal for his determination that the House had adequate square footage for his needs and Brookner would have been obligated to purchase the Property even if Lujan-Vigil had correctly measured the House.

13. Because Brookner failed to prove either of his claims against SSC, SSC is entitled

15

to judgment in its favor.


_____

SENIOR UNITED STATES DISTRICT COURT JUDGE